1, 2, 3, 4, 3, 8, 1, Ferros Capital Partners LP v. Deloitte and Touche, read all, oral argument, 15 minutes per side, Mr. Millamet for the appellant. Good morning, may it please the court, I've asked for 5 minutes in rebuttal just so the court is aware. My name is Rob Millamet of the law firm of Bickle and Brewer, located in Dallas, Texas, and I'm here on behalf of the appellant Ferros Capital Partners LP. Ferros is a private equity fund, meaning it raises funds to invest in private companies that require capital. And one of Ferros' first investments early on was in a company called National Century Financial Enterprises, or NCFE. And as this court has held in many cases in the last few years, NCFE was a massive fraud, criminally so. 6 to 10 people, principals of NCFE have been held criminally liable for the fraud that they perpetrated. I mean we've had those cases. Absolutely, and so the court is well aware that NCFE was a massive fraud. And my client Ferros invested $12 million of private equity into NCFE, and subsequently lost that money when NCFE collapsed as a result of its fraud being discovered by the public. And we are here today because Ferros brought claims to recover that lost investment against multiple parties, including Credit Suisse, an investment bank that was responsible for inducing and helping to provide information to my client Ferros about NCFE and the investment opportunity that was NCFE. Well, I mean you guys went to them first about this investment as I understand it, right? Ferros reached out to Credit Suisse and said, do you have any deals, transactions that we can look at? Credit Suisse responded, correct your honor, by saying we have a company right now that we're trying to raise equity for by the name of NCFE. And what Credit Suisse did was provide Ferros with the NCFE private placement memorandum, which started the ball rolling. It was meant to market the company, and Ferros was very interested in the opportunity after reviewing the NCFE private placement memorandum. And so the district court on Ferros' claims against Credit Suisse held that Ferros could not proceed to trial because it could not supposedly establish the reliance element, the element of reasonable reliance on either the misrepresentations in the NCFE PPM or on Credit Suisse proper. And so this court in 2000 in the Bass v. Janney case said that whether reliance is reasonable is not an issue that should be decided on summary judgment. Why not? I mean, you know, I'm not aware of that. I mean, any factual issue can be decided on summary judgment if you have no evidence or if you've signed something that stipulates to the contrary. Agreed, but in this case, as the court said in Bass, when you have a massive record that demonstrates numerous factual issues about whether or not Ferros reasonably relied on material, and it's not in dispute that these were material misrepresentations. Well, so now, I mean, so it depends on whether you've created a genuine issue. There's no categorical ban on summary judgment on this issue. I agree under certain circumstances, but my point was to say that this court has indicated that in general, when there's evidence in the record disputing the issue of reliance, that is an issue for the jury. Evidence that you've designated to the district court. I mean, I will say at the outset, all right, and you can tell us where you designated things as we go along, but you can't just back up a dump truck on the district court, unload the entire record, and say, Judge, you know, there's a genuine issue in there somewhere, and we should get to go to trial. I mean, the district court kind of went beyond the call of duty here, reviewing stuff that you did not designate. Your Honor, I would disagree with the point that we didn't designate sufficient evidence to raise a reasonable fact finding, a reasonable question of fact for the jury, and let me address that question directly. First of all, the evidence was such that this was a massive fraud, and one of the claims that were being brought under the Ohio blue sky law is whether or not Credit Suisse is jointly and severally liable for aiding NCFE's sale of those securities to Faroes pursuant to a false circular, and there is no question that the NCFE PPM was false in numerous material ways. It totally misrepresented the way the business was supposed to function, and as such, that evidence alone should have been sufficient. Why would you, what theory do you use to say the fact that Credit Suisse being the conduit, what theory do you say that the deal was bad, but they said, or your client said, we don't need any help. We know how to figure this out, and we're sophisticated investors, and the big boy. Your Honor is referring to the letter that was signed between Credit Suisse and Faroes. My first point, Your Honor, is that letter has no bearing, and it's not disputed, that that letter has no bearing on the Ohio blue sky, the secondary liability claim under the Ohio blue sky law 1707.43a. It has no bearing whatsoever, because the question under that Ohio statute is whether or not there were material misrepresentations made by NCFE. That you relied upon. That we relied upon in investing in NCFE. But how can you rely on something when you sign an agreement saying that I will not rely on anything. That agreement related only to Credit Suisse, and the information it received from Credit Suisse, it did not exculpate NCFE. And in fact, in the stock purchase agreement, NCFE specifically represented to Faroes that every document, every piece of information it received about NCFE and its business was accurate and true in all material respects. And so what we are talking about here on the secondary liability, the joint and several liability claim under the Ohio blue sky law, is whether or not NCFE perpetrated a fraudulent offering memorandum on which Faroes relied in investing in NCFE. And if it did, then Credit Suisse is jointly and severally liable because they aided and participated in that sale, and there is no dispute that Credit Suisse did so. So what we are focused on is the NCFE PPM. So the letter in your view is just saying we are not relying on anything you Credit Suisse has done. And so you are saying for the blue sky claim, the issue there is simply whether you reasonably relied on something in the PPM. Correct. Absolutely. Is that what the agreement says when you agree to exclusively rely on your own due diligence investigation and our own sources of investigation and our own credit analysis with respect to the securities? Is that where you are coming from, from this language? Yes, because that language is focused on the information it received from Credit Suisse. It doesn't exculpate NCFE. It doesn't exculpate NCFE's failure to tell Faroes exactly what its business actually was doing. And that's the whole reason why that letter has no bearing on the secondary liability claim against Credit Suisse. Because what we are talking about here is NCFE's misrepresentations. Okay, explain to me how secondary liability is different from primary liability. Sure. Under the Ohio Blue Sky Law, 1707.43a, it renders anyone in any way that participates or aids the sale of securities in a fraudulent manner jointly and severally liable with the seller. The seller here is NCFE. The joint and several liability party here is Credit Suisse. And so under 1707.43a, there has to be a predicate violation. The predicate violation is 1707.41a. And under that statute, Credit Suisse received $450,000 for placing the Faroes' purchase of stock with NCFE. And under 1707.41a, Ohio law says that Credit Suisse would be held liable for jointly and severally aiding and facilitating the sale of Faroes' purchase of stock in NCFE. So we're talking about the statutory language here. The statute, Ohio passes law back in 1929. We're talking about reasonable reliance, are we not? We're talking about reasonable reliance. You say there's no reasonable reliance for primary liability, but there is reasonable reliance for secondary liability, is that what you're saying? Yes, because there's a difference between who on whom you are relying. There's different claims that Faroes is bringing here. And as to the secondary liability claim, the reliance needs to be on the NCFE PPM or the representations by NCFE, not Credit Suisse. As to the primary liability claims against Credit Suisse... Okay, but who's the defendant here? Credit Suisse. Okay. So, I mean, you're suing Credit Suisse. Correct. Okay. All right. I'm trying to go through your...  I'm trying to help. I'm trying to understand your argument. Let me know if I'm not. I don't think you are, but... Okay. Go ahead. Well, I'm trying to indicate that the statutory... The people of Ohio have established a regulatory regime that indicates how you can sell securities and how you have to sell securities in a way that is honest with integrity and renders you liable. It's kind of a strict liability. It is a strict liability statute. That's what we argued below, and I think it's very clear from the case law, the limited case law about the statute, that says it's strictly liable if you demonstrate the predicate for the misrepresentations. And, again, there's no dispute. But let me just ask you on this one. I mean, here's my concern with this argument you're making. Number one, I'm having a hard time seeing where you designated in the district court record that, you know, evidence supporting the proposition that you actually relied on something in the PPM, number one. And, number two, the PPM is just the start of the process, and your clients are very sophisticated, and they had to do their own due diligence. And the PPM, at the end of the day, when they make the decision, is way in the rearview mirror. Why is it reliable for them to have relied upon the admittedly fraudulent statements in that document? Sure. I'm about to run out of time, but I'm happy to answer your question, and I'll take it out of my rebuttal time. Sure. The point here is that the NCFE PPM was a marketing document. Right. The marketing document. It's not something you say, okay, boy, that's great, and here's my $12 million. But the PPM supposedly discussed and described every aspect of what NCFE's business was. And based on that, Farrows followed up and asked questions, both of Credit Suisse and the company, about what does this mean? What does that mean? And then when they get to the final transaction, NCFE again represents that every piece of information you have received from us, including the PPM, is accurate in all material respects. And so by demonstrating that Farrows reviewed and relied and followed up on figuring out how the company was supposedly functioning, as the district court held in the note-holders order. Yeah, but you guys aren't the note-holders. Agreed, we're not the note-holders. You're very different from the note-holders. Absolutely we are different. But the evidence is still the same about the massive fraud that NCFE committed, the findings that the district court made that are the same as the Farrows, which is that Credit Suisse is a fact issue, about Credit Suisse concealing the fraud from both the note-holders and Farrows. The same evidence. We didn't know about it. Well, we'll ask them about that. Sure. And if I could, I'd like to reserve the rest of my time for rebuttal, and I'm happy to address that question. I appreciate it. Thank you. Thank you. Good morning. May it please the court, my name is Steve Brody, and I am with the law firm of Bingham & McCutcheon, and represent Defendant Apelli Credit Suisse in this case. The district court correctly dismissed all claims against Credit Suisse because Farrows has not, as a matter of law, established a triable issue regarding justifiable reliance. That is true with respect to both the 1707.41 claim, which is the primary liability claim, and with respect to the 1707.43 claim, which is the secondary liability claim. The facts are extraordinary in this case, and the panel has already touched upon them. My preference, if it's okay with the panel, is before I go back and tell that story, which the panel probably is aware of from the briefs, is to touch upon some issues that were brought up in the reply brief of Appellant so that I can make sure I get to those. And some of these, in fact, the court has already asked some questions about. The first is this issue about undesignated evidence, and Farrows wants to be able to rely on this appeal on undesignated evidence from the about 11,000 pages that it did present to the district court judge, but only designated a very small amount. The only legal argument that Farrows musters on this point is a quote from the unpublished decision in Lidochem. As a threshold matter, Lidochem is somewhat of an outlier in Sixth Circuit authority. The weight of Sixth Circuit authority holds that the district court was not required to go beyond the evidence or the lack of evidence raised by Farrows. And I could cite there to the Emerson v. Novartis decision 446, Federal Appendix 733 at 736, which is the famous quote, and Judge Cook actually said on this panel, a somewhat colorful quote, that, quote, judges are not like pigs hunting for truffles that might be buried in the record, close quote. Is that from Judge Martin, maybe? I believe it may have been. Sounds like him. The other decision I would point to is the Wimbush, W-I-M-B-U-S-H v. Wyeth decision 619, F-3rd, 632 at 638, Note 4, and I'll quote again, rather than just dropping a pile of paper on the district judge's desk, parties must point to the evidence with specificity and particularity. In any event, Lidochem does not compel a different result here. It stands only for the proposition that an appellate court has the, quote, power to consider the entire summary judgment record, close quote, not that it must do so. It is perfectly within the province of this court, and it was within the province of the district court, to disregard any and all evidence that Farrows did not designate below under binding Sixth Circuit precedent. The second point I'd like to make, and it's a short one, is Farrows says repeatedly in its submissions, for example, in its reply brief on this appeal at page eight, that it was not put on notice that its evidentiary submissions about reasonable reliance were inadequate. But the fact is that Credit Suisse told Farrows in Credit Suisse's opening brief on the motion for summary judgment, that its evidence was insufficient. And it's at appendix page 11175, and Farrows failed to remedy that situation in its opposition brief. The third point that I want to touch on is the law of the case notion that has been brought up by Farrows, and it's been brought up by Farrows only in its reply brief. And I don't, you don't have to worry about the law of the case. I mean, they're two different parties. Two different parties. So we've got the underbrush cleared out of the way here. Let me ask you just about the two concerns I have with your position. I mean, let's set aside the question whether anything was designated, and I do appreciate the authority you mentioned on that point. There does seem to be some evidence, though, that Credit Suisse, is it Suisse or Swiss? Depends which continent you're on. Paris? Okay. There does seem to be some evidence that your client did have some awareness of the disparity between what NCFE was representing to investors and what they were actually doing over there. I mean, we have some internal emails about, you know, did your nose grow and things like that. And so I guess my question to you is, isn't it fair to say that your client did have some unique knowledge? I don't want to use peculiar knowledge in a term of art sense, but some unique knowledge of the wrongdoing that was going on at NCFE. So at the threshold, I would say that this case, the decision below, concerns justifiable reliance, which is completely separate from what knowledge Credit Suisse had. And the judge below did find that there was certain evidence with respect to knowledge or the hinting of knowledge, and that was a contested issue. And it is certainly Credit Suisse's position that it did not know about any of this wrongdoing. In fact, Credit Suisse lost more than $250 million itself on the securities issued by NCFE, which is a strong indication that it did not know. It would be illogical otherwise. But in terms of the strict liability that we were talking about, why is this vouching not sufficient? Well, I would say there are four reasons why it's insufficient. And this is the 1707.43 claim, I take it, that Your Honor is referring to. The first is that Farrows cannot identify a specific false statement on which it relied, a specific false statement in the PPM on which it relied. And there was extensive discovery, extensive opportunity to identify any such statement. They absolutely failed to do it. At best, they made very general statements that we generally relied upon, the PPM, but no specific statements upon which they relied. And there you mean they didn't point to one in particular that was important to them? I mean, there were false statements in that PPM, right? About the advancing, the non-advancing age of receivables, reserve accounts, right? Well, all sorts of responses to that. First, the age of receivables and the reserve accounts, those were all things that were learned by Farrows during its five-month investigation of this company. And, in fact, I can give cites on that if the Court would like. I was just trying to clarify what you were saying. You're saying you're not disputing that there were false statements in the PPM. You're just saying they didn't point to one in particular and show that they relied on that one. I would dispute it to a certain extent, which is this. If you look at the PPM, what it describes is actually how the program should work, not about how the program actually has been working, and I think that's an important distinction. If I may return to the question asked by Judge Kerr. Yeah, I'm sorry. First, I said there's no specific false statements. Second, the PPM says that investors must rely on their own diligence. That's clear. The third reason is that the investors were told in the PPM that they could rely only on the representations and warranties made in the final purchase agreement. This was a business decision made by the parties. This was a business decision made not by Credit Suisse but by NCFE and by Farrows. And the business decision they reached, which is contained in their documents and a couple of documents signed by Farrows, in fact, is that Farrows and any other investor could only rely on the final purchase agreement, and Credit Suisse was not a party to that final purchase agreement. What was your client's role in this transaction? How would you characterize it? Credit Suisse was a placement agent. As a placement agent, when it received the call from Farrows, which it had only a limited relationship with, at that time, Credit Suisse had been retained to help place, to help sell the securities. By NCFE. Had been retained by NCFE. Now, an interesting thing about that, and this is in the record, it's...  Okay. That's all right. Is that the engagement letter between NCFE and Credit Suisse was in the possession of Farrows. And Farrows said that it had reviewed that engagement letter, and what that engagement letter... It was in their possession by virtue of having been offered by your client? It was in their possession because, I believe, because it was delivered by the co-placement agent of my client, which is called the Shatton Group. Okay. That it was delivered by the Shatton Group to Farrows. And what that letter said, basically, is, Credit Suisse is not taking responsibility for the accuracy of any of the information. That is solely the responsibility of NCFE. And that's absolutely clear in this engagement letter, which Farrows admits it reviewed. So you guys were just kind of a matchmaker, and then it's up to Farrows to go root around and make sure they're comfortable with the deal. Is that fair? Yeah. It was our client's responsibility to make introductions, to present opportunities. But then, as it was in this case, Farrows spent five months doing its own diligence. Farrows established direct lines of communication with senior officers at NCFE. Well, let me ask you about that because, you know, I mean, this isn't our first NCFE case. I've had, you know, a case or two with some of the folks you're talking about, the direct line, on the other end of the direct line. And they're all in prison because they were complete liars, and they created false documents. Sherry Gibson all day long. Roger Falkenberry all day long.  What is the benefit of that direct line when they're just going to get lied to any time they call? It's not like Roger Falkenberry. Farrows calls, and he's going to say, okay, you got me, yep. We've been moving the reserve accounts and, you know, et cetera. Well, the unfortunate truth is if there's a commercial party out there that wants to commit fraud, sometimes it's going to get away with it. And sometimes it's going to get away with it for a long period of time. And here it got away with it for a long period of time. But what I would emphasize is that in those other cases, in the prior testimony from Sherry Gibson and others, what was found is that NCFE deliberately lied not just to everybody generally, but specifically to Credit Suisse. And, in fact, it doctored documents before sending them to Credit Suisse, which was clearly designed to fool, specifically fool Credit Suisse. They doctored tons of documents. And so, I mean, it is interesting, you know, to hear you at least emphasize that your client lost money, et cetera. But what value is this direct line, is my question, when there are just a bunch of liars on the other end of it? Well, the value of the direct line is, from our perspective in this case, a justifiable reliance issue, which is can Farrows say that they relied on Credit Suisse? Can Farrows say it relied on the PPM? When Farrows had the full opportunity and had access to the documents and established these independent relationships, and even the day before they made their investment, physically met together with Lance Paulson. We had his case, too. Yeah, exactly. Went out to Dublin, Ohio, visited with Mr. Paulson and his colleagues without Credit Suisse being present. So, if I may just... So, I mean, that's the argument counsel raises. Well, Ohio law requires justifiable reliance under both claims. And the district court judge, you know, that was the basis of his reasoning. And it has to be reliance on the PPM? It can't be reliance on something that Lance Paulson, for example, would have said in that meeting? Well, the 43 claim, it has to be reliance on the PPM. That's clear from the language of the statute itself. I'm working my... There's the peculiar knowledge issue, which Farrows spends a great amount of time on, so I thought I should just touch upon that, if the court would indulge me with respect to that one issue in that limited time I have. First off, at the threshold, the peculiar knowledge exception does not apply under Ohio law, and Ohio law is the controlling law here. So that basically takes care of it, but there are many other reasons, and I will go through them. Even if New York law applied, Farrows cannot deny that it had access to the information about NCFE. It had thousands of pages delivered to it, as I said, in meetings with NCFE. They had access to information about the reserve accounts? They certainly did. But they had access to information about how those accounts moved back and forth every month? They certainly did. They had in possession, with respect to the reserve shortfalls, before they invested, various documents, including Appendix 13003-09, 13051-57, 14419-26. I won't name all of them. 14427-38, et cetera. And these were in their possession. And also, Farrows cannot show that Credit Suisse had knowledge of this KPMG report that they talk about, let alone peculiar knowledge of it. Obviously, we don't have peculiar knowledge here, because there are many other entities outside of Credit Suisse that knew about these issues, so there cannot be peculiar knowledge. I saw that you noticed that time is up. Sorry, I stopped speaking. Now we both know. Thank you. Thanks. I want to focus on the secondary liability claim. That claim is based on whether or not NCFE made material misrepresentations in the PPM on which led to Farrows relying on it and ultimately investing in NCFE. So, for example, one was about the reserve accounts, right? Yes, about the reserve accounts. Okay, so just for example, one is about the reserve accounts. Absolutely. And as you know, NCFE was moving the entire balance of reserve accounts back and forth depending on which one was being tested. Farrows did not know that. Farrows knew that there were movements, and our people thought... Right, but if you see the entire balance going back and forth... We didn't see that. No, we didn't see that, Your Honor. Did your due diligence include information about the reserve accounts? It included information about the reserve account balances, but those documents, as Your Honor noted, were false. We knew that the movement went up and down a little bit because transactions happened within the month. So you didn't get actual, accurate balance information for the reserve accounts? You're saying that was doctored information? That's correct. Okay. Let me back up. This Court's review is de novo. And let's focus on what the pleadings were in the Court below. On the secondary liability claim, Credit Suisse, in its opening motion, argued that Farrows reviewed and relied on the NCF PPM. That was their position. And so in response to that, we said, yes, you're right. We did review and rely on the PPM, and therefore we didn't have to marshal any additional evidence under the Supreme Court's evidence. Then in its reply brief, Credit Suisse argues, no, no, no. We didn't mean that you didn't rely on the NCF PPM. You didn't specifically identify what statements you didn't rely on. And at that point, under this Court's precedent, in a royal issued in 1989, the District Court is going to rely on that basis for kicking Farrows' secondary liability claim. It should have provided us with notice and an opportunity to amend our pleading to specifically identify what representations were not stated succinctly for the Court. Did you file a motion to amend? No, Your Honor, we did not. We didn't have the Court's opinion. Have you appealed the denial of motion to amend? No, we've appealed the Court's order. I thought you just told me that the Court should have allowed you to amend. This Court's ruling in inter-royal in 1989. But you didn't file a motion to amend, so how can the Court grant you a motion to amend if you haven't filed a motion? You're absolutely right. We did not file a motion, but a motion is not required in this Court's precedent. This Court reversed the summary judgment grant in inter-royal because it found that the District Court in that case should have given the notice to the non-movement and an opportunity on its own accord to amend its pleading to provide specificity if that's what the District Court was looking for. And that did not happen here. And that's important. We only were required to demonstrate sufficient evidence to raise a fact issue. We didn't have to marshal all of our evidence. And the evidence here was that the NCFE was a massive fraud. They totally lied. That's stipulated. Everybody knows that. Absolutely. And so that should be enough. Under the Second Circus Decisioning Rule... It's not enough. I mean, your client is a sophisticated investor who had all kinds of opportunity to do diligence. Goldman figured it out. I mean, how come your client couldn't figure it out? Because that information wasn't provided to us. No, Goldman figured it out, as I understand it, kind of doing their due diligence. You guys asked for easy-to-forward diligence materials. That's correct. There was about a 20-page booklet put together of questions that were propounded by Goldman Sachs and CIBC that was answered by Credit Suisse, NCFE, and Shatton Group. Couldn't you have asked the same questions? I mean, why do you have some right to piggyback on Goldman's work? I don't know what the due diligence was between Goldman Sachs and NCFE. We were not privy to that. All we know... They figured it out. Goldman Sachs apparently did figure it out. One of your partners didn't want to do it either. The evidence was also that CIBC and Goldman Sachs had evidence that they were told, either by Shatton Group or Credit Suisse or NCFE, that the reserve accounts were missing tens of millions of dollars. There's no evidence in the record that Feros had that same level of information. I want to clarify whether or not there was a point where Feros was denied information that it requested. That's absolutely correct. That evidence was the Goldman Sachs and CIBC questions that were answered by NCFE and Credit Suisse. From whom was that information requested? It was requested by Feros from Credit Suisse. Credit Suisse had that information less than a month before Feros asked for that information, and the district court in the no-holders order specifically said that was evidence, that was material, that was withheld from investors, and therefore even if investors had taken additional investigation, it is a genuine issue of fact whether or not they could have discovered the fraud because Credit Suisse had information that it didn't disclose to others, including Feros. And that there was a specific request for that information by Feros, the sophisticated investors that make up that group. That's correct, and even the placement agent, at her deposition by Credit Suisse, said my job is to provide anything from the company that the client asked for, and they didn't do it here. They didn't do it here, and that is undisputed. Thank you so much for your time this morning, Your Honors. Thank you. Thank you. All right. Appreciate the arguments. It's a very interesting case. Court will take the matter under advisement, issue an opinion in due course. We will have the next case, please.